FIRST JUDICIAL DISTRICT
SIXTH DIVISION
DATE: May 6, 2011

No. 1-08-0194

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 06 CR 26796 |
| | ) | |
| TERRELL HAMMONDS, | ) | Honorable |
| | ) | Marcus R. Salone, |
| Defendant-Appellant. | ) | Judge Presiding |

JUSTICE ROBERT E. GORDON delivered the judgment of the court, with opinion. Justices Cahill and Joseph Gordon concurred in the judgment and opinion.

## OPINION

On August 29, 2007, defendant Terrell Hammonds was convicted by a jury of delivering a controlled substance (720 ILCS 570/401(d) (West 2006)). On December 10, 2007, the trial court sentenced defendant to seven years' imprisonment and denied defendant's posttrial motion.

On direct appeal, defendant sought a reversal of his conviction and a new trial, due to five claimed errors. Defendant claimed that the trial court erred : (1) by giving the third paragraph of Illinois Pattern Jury Instructions, Criminal, No. 17.05A (4th ed. 2000) (hereinafter IPI Criminal 4th), which specified that a drug "delivery"did not require a transfer of money or consideration; (2) by allowing

police officers to testify, over defendant's hearsay objection, about radio messages received from other officers, who were also trial witnesses; (3) by failing to ask potential jurors whether they understood and accepted certain principles of law listed in Illinois Supreme Court Rule 431(b) (Ill. S. Ct. R. 431(b) (eff. May 1, 2007)); and (4) by refusing to rule, until after defendant testified, on defendant's motion *in limine* concerning the admissibility of defendant's prior convictions for impeachment purposes. Defendant also claimed that (5) prosecutorial misconduct during the State's rebuttal closing denied defendant a fair trial. In an opinion filed February 11, 2010, we considered carefully each of defendant's claimed errors and found that a new trial was not warranted. *People v. Hammonds*, 399 Ill. App. 3d 927 (2010)

In *People v. Thompson*, 238 Ill. 2d 598 (2010), the Illinois Supreme Court addressed one of the issues raised by defendant, namely, how an appellate court should review alleged violations of Supreme Court Rule 431(b). Ill. S. Ct. R. 431(b) (eff. May 1, 2007). In *Thompson*, the *Hammonds* decision was the only appellate court case on this issue which was discussed and cited with approval. *Thompson*, 238 Ill. 2d at 615-16.

On January 26, 2011, in the exercise of its supervisory authority, our

supreme court directed us to vacate our *Hammonds* decision, so that we could reconsider our judgment in light of *Thompson,* to determine if a different result is warranted. Thus, we subsequently vacated our prior *Hammonds* judgment.

Having reviewed *Thompson*, as well as defendant's other claims*,* we still find that a new trial is not warranted.

## BACKGROUND

Defendant's two-day trial began with jury selection on August 28, 2007, and culminated in a guilty verdict on August 29, 2007.

### I. *Voir Dire*

Following the swearing in of the pool of potential jurors, the trial court informed the venire of certain principles of law, namely: (1) that a defendant is presumed innocent; (2) that he is not required to offer any evidence in his own behalf; and (3) that he must be proved guilty beyond a reasonable doubt. However, the trial court did not inform the potential jurors of a fourth principle of law, namely, (4) that a defendant's failure to testify in his own behalf cannot be held against him. The trial court also failed to ask the prospective jurors whether they understood and accepted these four principles of law.

With respect to these principles of law, the trial court stated, in pertinent

No. 1-08-0194

part:

"Under the law, a defendant is presumed to be innocent of the
charge against him. This presumption remains with him throughout
every stage of the trial and during the deliberation on a verdict. It is
not overcome from [*sic*] unless from all of the evidence in this you are
convinced beyond a reasonable doubt that the defendant is guilty.

The State has the burden of proving the guilt of the defendant
beyond a reasonable doubt. And this burden remains on the State
throughout the case. The defendant is not required to prove his
innocence nor is he required to present any evidence on his own
behalf. He may rely on the presumption of innocence. You are the
judges of the facts in this case ***."

The trial court did later inform the jury of all four principles of law during
the jury instructions after the close of evidence.

## II. Evidence at Trial

After jury selection and opening statements, the State presented its
evidence. Defendant did not testify or call witnesses. On this appeal, defendant
did not claim that the evidence at trial was insufficient to convict him.

4

Nonetheless, we will still describe in detail the State's evidence at trial, since we will need to decide whether this evidence was closely balanced, when we consider the plain-error doctrine. (See section III(C) of this opinion.)

At trial, the State called four witnesses in its case-in-chief. Three witnesses were Chicago police officers, Marco DiFranco, Boonserm Srisuth, and Detective William Smith, who were members of the undercover narcotics investigation team that arrested defendant. The remaining witness was Paula Bosco Szum, a chemist with the Illinois State Police crime laboratory, who analyzed the evidence recovered after defendant's arrest.

The first officer to testify, Officer Srisuth, stated that he was part of a nine-person narcotics investigation team. In the late morning of November 11, 2006, he and other members of his team arrived in the neighborhood of Lamon Avenue and Thomas Street in Chicago, Illinois. Srisuth explained that, when his team anticipates making a controlled buy, the duties of the officers are divided among an "enforcement officer, [a] surveillance officer and [a] buy officer." On this particular day, Srisuth was the buy officer, and thus he wore civilian clothes and drove an unmarked vehicle. The second witness, Officer DiFranco, was the surveillance officer, and Detective Smith, one of the enforcement officers, was

the fourth witness to testify at trial.

Officer Srisuth testified that he responded to a radio transmission from the surveillance officer, Officer DiFranco. At that point in the testimony, defendant objected on hearsay grounds. Over defendant's hearsay objection, Srisuth testified that he heard DiFranco state over the radio that "a male black wearing a black skull cap, black jacket, black sweatpants with a white stripe and white gym shoes *** was selling drugs" in the vicinity of 1057 North Lamon Avenue.

Officer Srisuth testified that, at approximately 11:14 a.m., he drove northbound on Lamon Avenue toward 105 North Lamon Avenue and observed defendant, who was the only person present in the area matching DiFranco's description. Srisuth parked his unmarked vehicle on Lamon Avenue, and defendant approached Srisuth's passenger window. Srisuth asked defendant if he had any "rocks," which Srisuth testified was "street terminology for crack cocaine." Srisuth testified that defendant asked him how many he wanted, to which Srisuth responded that he wanted only one. Srisuth testified that defendant removed a small, green-tinted ziplock bag from his mouth. Srisuth testified that the bag contained a white, rock-like substance. Defendant gave Srisuth the bag, and Srisuth gave defendant a prerecorded $10 bill.

Officer Srisuth testified that, after the transaction was complete, he left the area and radioed the other officers that "a positive narcotics transaction" had occurred. He also provided the other officers with a physical description of defendant, including defendant's clothing and location. Srisuth testified that the surveillance officer later instructed him to drive by the vicinity of 1031 North Lamon. At that location, Srisuth observed defendant "being detained by the enforcement officer" and Srisuth identified defendant as "the individual that sold [Srisuth] the narcotics."

The State's second witness was Officer DiFranco, the surveillance officer. He testified that, at approximately 11:10 a.m. on November 11, 2006, he established a surveillance position on North Lamon Avenue, where he had observed defendant loitering on the corner. DiFranco explained that, as a surveillance officer, it was his responsibility to "monitor" the location and to keep the team informed. DiFranco testified that, on the day in question, he had "converted [himself] into a utility worker" and that he was driving an undercover vehicle. From his surveillance position, which was approximately "two-and-a-half car lengths" from defendant, he observed an unknown male approach defendant and hold a brief conversation with him. Defendant then pulled a small

7

item from his mouth and gave it to the unknown male. DiFranco observed the unknown male hand currency to defendant and leave the area. Based on his experience, DiFranco suspected that a narcotics sale had just occurred.

Officer DiFranco testified that he radioed the other officers on his team and informed them of what he had observed. Specifically, DiFranco testified that in his radio transmission, he described defendant as "a male black wearing a black skull cap, a black jacket, black sweatpants with a white stripe, and white gym shoes," and he informed the team of defendant's location. DiFranco testified that, in response to this radio call, Officer Srisuth arrived in "less than a minute." DiFranco observed Srisuth approach in an unmarked vehicle, which Srisuth "curbed" near 1057 Lamon Avenue. At that moment, DiFranco was positioned approximately "two-and-a-half car lengths" behind Srisuth's vehicle, and there were no other vehicles between his vehicle and Srisuth's vehicle. He testified that nothing blocked his view of either Officer Srisuth or defendant.

Officer DiFranco testified that, after Srisuth stopped his vehicle, DiFranco observed defendant approach the passenger side of the undercover vehicle. DiFranco observed defendant and Srisuth hold a brief conversation, after which defendant retrieved a small item from his mouth and handed it to the buy officer.

8

DiFranco testified that, during the exchange, a "late model Grand Am *** curbed right in front of [DiFranco] and behind the [buy] officer." DiFranco then observed Srisuth's vehicle drive away, and he informed his team by radio that a narcotics transaction had occurred.

Officer DiFranco testified that he "stayed in constant surveillance" of defendant after Srisuth's vehicle departed. Defendant next approached the driver's side of the white Grand Am. DiFranco observed defendant and the driver of the Grand Am hold a brief conversation, after which defendant pulled a small item from his mouth and handed it to the driver. DiFranco testified that defendant reached into his left pants pocket and "pulled out an unknown amount of United States currency which he was holding." Defendant was "flipping them back, and he then pull[ed] out an unknown amount of denomination, USC [*sic*] currency, and he tender[ed] it to the white male driver." DiFranco testified that the driver then handed defendant "an unknown amount" of United States currency and the Grand Am departed.

Officer DiFranco testifed that, after the Grand Am's departure, defendant started walking south on Lamon Avenue. DiFranco informed his team by radio of

9

defendant's location while maintaining constant surveillance of defendant. DiFranco then observed the enforcement officers, Detective Smith and Officer Pentimone, arrive and exit their vehicle. After the enforcement officers detained defendant, DiFranco informed the rest of the team by radio of the detention. DiFranco also instructed "the buy officer to drive around the immediate area" in order "to see if that was the actual seller." Officer DiFranco observed Officer Srisuth drive by four or five minutes later, and DiFranco heard Srisuth inform the team by radio that defendant was the person who had sold drugs to Srisuth. Immediately after DiFranco testified about Srisuth's radio confirmation, the defense objected[1] and the objection was overruled.

Officer DiFranco testified that the enforcement officers arrested defendant and conducted a search of defendant. DiFranco observed that the officers reached into defendant's left pants pocket and retrieved a bundle of United States currency. The State's third witness was Paula Bosco Szum, a chemist with the Illinois State Police crime laboratory. The chemist was qualified as an expert in

---

[1]The trial court stated "overruled" immediately after defense counsel stated "objection." Thus, defense counsel did not state the basis for the objection. However, we presume from the context of the record that the basis was hearsay.

"the field of forensic chemistry and the analysis of narcotics" without objection from the defense. She testified that she analyzed evidence recovered in the case at bar[2] and that the item tested positive for the presence of cocaine and weighed one-tenth of a gram.

The State's fourth witness was Detective Smith, one of the enforcement officers who participated in defendant's arrest. Smith testified that, as an enforcement officer in an undercover operation, he was dressed in civilian clothes and drove an unmarked vehicle. Smith explained that, after the buy officer completes a narcotics purchase, the enforcement officer is notified and provided with a description of the seller. It is the role of the enforcement officer to detain the seller and place him into custody.

Detective Smith testified that, on November 11, 2006, he was working with his partner, Officer Jerry Pentimone, when he received a radio transmission from the buy officer, Officer Srisuth. At this point in the testimony, the defense made a hearsay objection, which was overruled. Over the defense's objection, Smith testified to the contents of the radio transmission. Smith testified that Srisuth

---

[2]This opinion omits descriptions of the chain of custody since the defense raised no challenge to it, either at trial or on this appeal.

11

stated that he had completed a controlled purchase of narcotics and that Srisuth provided a description of the seller's physical appearance and clothing.

Detective Smith next testified that he received a radio transmission from the surveillance officer, Officer DiFranco. The defense objected again on hearsay grounds, and the objection was overruled. Detective Smith testified that, in the radio transmission, DiFranco confirmed that the buy officer had completed a transaction and DiFranco further stated that the seller had completed a second transaction and had started to walk southbound on Lamon.

Detective Smith testified that, after receiving a description by radio from both the buy officer and the surveillance officer, he proceeded to the area of North Lamon and observed a person matching this description. Officer Pentimone, who was driving, stopped their vehicle. Both officers then exited and approached. Detective Smith then announced that they were police officers, and they detained defendant. After detaining defendant, Smith testified that he received a radio transmission from the surveillance officer, Officer DiFranco. At this point in the testimony, the defense objected,[3] and the objection was

---

[3]The witness had begun to answer the question when the defense counsel stated "objection." After the objection, the witness continued answering. Then the

overruled. Smith then testified to the contents of the radio transmission, which was a confirmation from DiFranco that they had detained the "right" individual.

Detective Smith further testified that he observed the buy officer, Officer Srisuth, drive by. Without defense objection, Smith testified that Srisuth radioed "confirming that [they did] have the right gentleman stopped." Smith's partner, Officer Pentimone, then performed a search of defendant and recovered $140 in United States currency from defendant's left front pants pocket. The money was in "different denominations, twenties, tens, fives and some singles." The officers looked for, but did not recover, the prerecorded $10 bill that was used in the undercover purchase. They also did not find any drugs present on defendant's person.

### III. Jury Instructions

After the detective's testimony, the jury was excused from the courtroom and the trial court held a conference on jury instructions. Defense counsel stated

---

trial court interrupted the witness's answer to say "overruled," and the witness finished his answer. As a result, defense counsel did not have an opportunity to state the basis for his objection; however, we presume from the context of the record that the basis was hearsay.

that there was only one jury instruction in dispute. The prosecutor requested the first and third paragraphs of IPI Criminal 4th No. 17.05A, and the defense objected.

IPI Criminal 4th No. 17.05A provides in its entirety:

"17.05A Definition of Deliver

[1] The word 'deliver' means to transfer possession or to attempt to transfer possession.

[2] The word 'deliver' includes a constructive transfer of possession which occurs without an actual physical transfer. When the conduct or declarations of the person who has the right to exercise control over a thing is such as to effectively relinquish the right of control to another person so that the other person is then in constructive possession, there has been a delivery.

[3] A delivery may occur with or without the transfer or exchange of money, or with or without the transfer or exchange of other consideration."

The prosecutor explained to the trial court that she did not ask for paragraph 2,

"because this [was] not a constructive transfer situation."

In his objection, the defense relied on the committee note accompanying the instruction. This note states that "[g]enerally" when "the delivery in question was an actual physical transfer of possession, no definition of the term need be given to the jury," since "[t]he term, in this sense, is commonly understood by [the jury]." IPI Criminal 4th No. 17.05A, Committee Note, at 308. However, the note also stated that "[p]aragraph [3] may be given when the Court believes it would help the jury understand the issue." IPI Criminal 4th No. 17.05A, Committee Note, at 308.

Relying on the committee note, defense counsel explained her objection, as follows:

> "DEFENSE COUNSEL: If you look at the committee notes, your Honor, for 17.05A, it states that when an offense involves a delivery and the evidence indicates that the delivery in question was an actual, physical transfer of possession, no definition of the term may be given to the jury. The term in this sense is commonly understood by the layman. That would be the basis of our objection to the entire instruction."

15

After listening to defense counsel, the trial court then ruled in defendant's favor, stating:

"THE COURT: Okay.

It's out. It's out. Subject to the jury asking for a

definition of delivery."

Even though the trial court had just ruled, the prosecutor interjected:

"PROSECUTOR: But, Judge, if I can just say this?

The committee notes say it need not, which to me

is not – my understanding of that is that it is not

necessary if it's not being asked for.  I'm asking for it

for a couple of reasons.

First, I think the term deliver can be subject – I

think it's a little confusing, the term deliver, where this

just simplifies it.  It just means a transfer of possession.

Additionally, Paragraph 3, the State is asking for

it because it is entirely relevant in this case because the

[prerecorded $10 bill was] not recovered.  What this

tells the jury, we don't need the [prerecorded $10 bill]

because a delivery takes place regardless of an exchange of consideration, regardless of any money being exchanged or recovered. And I think that is absolutely relevant in this case.

They can ask for this as a clarification, but there is – there has been – this entire trial has been replete. Every single witness was questioned about [this prerecorded $10 bill], making it as though it's entirely necessary for the delivery to take place and that's why we are asking for this instruction."

In response, the trial court reviewed the committee note, particularly the section that provided the court with discretion about whether to give paragraph 3, and the trial court held, with respect to paragraph 3, "[t]hat's all that needs [*sic*] be given." To clarify, the prosecutor asked if she should "take out [paragraphs] one and two and just do [paragraph] three" and the trial court agreed. Thus, reversing its prior ruling, the trial court stated that paragraph 3 will be "given over defendant's objection."

IV. Closing Argument

17

After the jury instruction conference, the State moved its exhibits into evidence, and both the State and the defense rested. The parties then proceeded to closing arguments.

In her closing argument, defense counsel challenged the police investigation, noting that the prerecorded $10 bill was not recovered and that the police chose not to submit the drug evidence for fingerprint or DNA testing.

Defense counsel discussed the missing $10 bill at length, stating:

"You don't have any [prerecorded] money. You heard us talk extensively all day about [prerecorded] money. [Prerecorded] money helps corroborate that they have the right individual in custody, the individual that supposedly was involved in that transaction.

You do not have any [prerecorded] money recovered off [defendant], and you have a lame hypothesis or excuse, I'm not sure what it is, of where that may have gone, in that he gave money to someone in a car.

Now, that is preposterous. He gave money to someone in a car before that person ever gave any money. That doesn't make any sense. He gave money

to someone in a car who easily could have been stopped by the Chicago Police Department.

This person wasn't even stopped. You don't know whether this person had [prerecorded] money on them."

In its rebuttal argument, the State responded:

"Counsel has talked to you about that. There are no [prerecorded funds] recovered in this case. You're going to receive the law from the judge. What he's going to tell you speaks directly to these [prerecorded funds].

For the offense of delivery to occur, you will receive an instruction that says a delivery may occur with or without the transfer or exchange of money, or with or without the transfer or exchange of other consideration.

You're not going to get an instruction that says you can't find this defendant guilty because there weren't [prerecorded funds] recovered, or there wasn't

money recovered. It's not necessary.

> Our law does not even require that the money be given or that money be taken or recovered. That's not the law. It doesn't matter. It doesn't matter."

Following closing arguments and jury deliberations, the jury found defendant guilty of delivery of a controlled substance, in violation of the Illinois Controlled Substances Act (720 ILCS 570/401(d) (West 2006)).

### V. Posttrial Motion and Sentencing

On September 27, 2007, defendant filed a motion for acquittal notwithstanding the verdict or, in the alternative, for a new trial. The motion alleged general grounds such as lack of due process and failure to prove guilt beyond a reasonable doubt. The one specific allegation was that the trial court erred by giving a jury instruction requested by the State, over defense objection.

On December 10, 2007, defendant filed an amended posttrial motion, which added the allegation that "[t]he Court erred by allowing Chicago police officers to testify to the content of their radio transmissions, thereby allowing the jury to hear impermissible hearsay evidence, and the [S]tate to bolster their case."

The trial court denied defendant's motion for a new trial. After arguments

No. 1-08-0194

in aggravation and mitigation, the trial court sentenced defendant to 7 years in the Illinois Department of Corrections with a credit of 395 days. The trial court denied defendant's posttrial motion. This appeal followed.

ANALYSIS

On appeal, defendant claims that the trial court erred: (1) by giving the third paragraph of IPI Criminal 4th No. 17.05A, which specified that a drug "delivery" did not require a transfer of money or consideration; (2) by allowing police officers to testify, over the defense's hearsay objection, about radio messages received from other officers, who were also trial witnesses; (3) by failing to ask potential jurors whether they understood and accepted the principles listed in Illinois Supreme Court Rule 431(b) (Ill. S. Ct. R. 431(b) (eff. May 1, 2007)); and (4) by refusing to rule, until after defendant testified, on defendant's motion *in limine* concerning the admissibility of defendant's prior convictions for impeachment purposes. Defendant also claims that (5) prosecutorial misconduct in the State's rebuttal closing denied defendant a fair trial.

For the following reasons, we affirm the trial court and find that a new trial is not warranted.

I. Jury Instruction Defining "Delivery"

21

On appeal, defendant claims that the trial court erred by giving the third paragraph of IPI Criminal 4th No. 17.05A, which specifies that a drug "delivery" does not require a transfer of money or consideration.

The User's Guide to the Illinois Pattern Jury Instructions explains that "[e]ach offense has at least two instructions: (1) a definitional instruction, and (2) a corresponding issues instruction." IPI Criminal 4th, User's Guide, at VII. In addition, the IPI Criminal 4th provides other types of instructions, such as those that "define a particular word or term." IPI Criminal 4th, User's Guide, at VII. It is this latter type of instruction, which defines a particular word or term, that is at issue in the case at bar.

The instruction at issue, IPI Criminal 4th No. 17.05A, provides a three-paragraph definition of the word "deliver." In the case at bar, the trial court gave only the third paragraph of the three-paragraph instruction. Both the State and the defense agree on appeal that the trial court was correct in *not* providing paragraphs 1 and 2. However, the defense argues that the trial court erred in providing even paragraph 3.

IPI Criminal No. 4th No. 17.05A is already quoted above, in its entirety, in the Background section of this opinion. As quoted earlier, the third paragraph

22

states: "A delivery may occur with or without the transfer or exchange of money, or with or without the transfer or exchange of other consideration." IPI Criminal 4th No. 17.05A.

Generally, a reviewing court will review jury instructions only for an abuse of discretion. *People v. Mohr*, 228 Ill. 2d 53, 66 (2008). Although there must be some evidence in the record to justify giving a particular instruction, the decision whether or not to give it is within the sound discretion of the trial court. *Mohr*, 228 Ill. 2d at 65. The trial court has the discretion to decide whether the evidence in the record raises a particular issue and whether an instruction on that issue should be given. *Mohr*, 228 Ill. 2d at 65. "Although jury instructions are generally reviewed for an abuse of discretion, our standard of review is *de novo* when the question is whether the applicable law was accurately conveyed." *Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d 163, 170 (2008).

The defense claims, first, that this instruction was inapplicable to the evidence since, as the committee note states, "the delivery in question was an actual physical transfer of possession, no definition of the term need be given to the jury." IPI Criminal 4th No. 17.05A, Committee Note, at 308. The defense claims, second, that even if the committee note provided the trial court with the

discretion to give paragraph 3, providing the paragraph minimized the State's burden of proof, by giving the jury the impression that the State did not have to prove a purchase.

The defense does not cite any case law to support its first argument that the committee note prohibited the trial court from giving paragraph 3. *Roiser v. Cascade Mountain, Inc.*, 367 Ill. App. 3d 559, 568 (2006) (by failing to offer supporting legal authority or "any reasoned argument," plaintiffs waived consideration of their argument); *People v. Ward*, 215 Ill. 2d 317, 332 (2005) ("point raised in a brief but not supported by citation to relevant authority *** is therefore forfeited"); *In re Marriage of Bates*, 212 Ill. 2d 489, 517 (2004) ("A reviewing court is entitled to have issues clearly defined with relevant authority cited."); *Ferguson v. Berger*, 302 Ill. App. 3d 61, 78 (1998) ("it is not necessary to decide this question since the defendant has waived the issue" by failing to offer case citation or other support as Supreme Court Rule 341 requires).

This is not surprising, since the defense's argument misreads the note. The note states that, in the case of an "actual physical transfer," no definition "need be given." The American Heritage Dictionary states that, as a verb, the word "need" means "[t]o be under the necessity of or the obligation to." American Heritage

Dictionary 835 (2d coll. ed. 1985) (hereinafter American Heritage). In its detailed "Usage" section following the word "need," the dictionary explains that "'you needn't come' means 'you are under no obligation to come.' " (Emphasis omitted.) American Heritage Dictionary 835 (2d coll. ed. 1985). Thus, the negative form, which is used in the note, means that, while the trial court was under "no obligation" to give the instruction, it was not prohibited either. American Heritage Dictionary 835 (2d coll. ed.).

If there was any doubt that the committee note provided the trial court with the discretion to give paragraph 3, that doubt was erased by the note's subsequent comment that "[p]aragraph [3] may be given when the Court believes it would help the jury understand the issues." IPI Criminal 4th No. 17.05A, Committee Note, at 308. Thus, the decision of whether to give paragraph 3 was left to the sound discretion of the trial court, as are most decisions regarding whether to give certain jury instructions. *E.g.*, *Mohr*, 228 Ill. 2d at 65.

The defense's second argument misconstrues the law, and almost underscores the need for the instruction. The defense argues that the issue for the jury to resolve was whether a drug purchase took place, and thus the instruction minimized the State's burden of proof.

However, the State did not have to prove that a purchase took place. The indictment accused defendant of "unlawfully and knowingly possess[ing] with intent to deliver *** less than 1 gram of a substance" containing cocaine, "in violation of Chapter 720, Act 570, Section 401(D)." To prove a charge of possession of a controlled substance with intent to deliver, the State must prove three elements: (1) the defendant's knowledge of the presence of narcotics; (2) the defendant's immediate possession or control of the narcotics; and (3) the defendant's intent to deliver the narcotics. *People v. Sanchez*, 388 Ill. App. 3d 467, 473 (2009); *People v. Rivas*, 302 Ill. App. 3d 421, 429 (1998). Section 401 of the Illinois Controlled Substances Act provides that "it is unlawful for any person knowingly to manufacture or deliver, or possess with intent to manufacture or deliver, a controlled substance." 720 ILCS 570/401 (West 2006). In contrast to what the defense argues, the statute does not require a sale or purchase as an element of the offense.

The Act defines the words "deliver" and "delivery" as follows:

"'Deliver' or 'delivery' means the actual, constructive or attempted transfer of possession of a controlled substance, with or without consideration, whether or not

26

there is an agency relationship." 720 ILCS 570/102(h) (West 2006).

The words "with or without consideration" in the above definition make clear that a sale or purchase is not required for a "delivery." 720 ILCS 570/102(h) (West 2006). Thus, the words of the Act that define both the offense and the word "delivery" leave no doubt that a sale or purchase was not part of the State's burden of proof.

The defense claims in its appellate brief that the purpose of paragraph 3 is "to clarify that a delivery can occur between friends, as a gift, or in other non-traditional transfers of contraband." The defense makes this argument without any case support or other authority. The State could have just as easily argued that the purpose of this paragraph is to clarify that a delivery can occur -- with or without recovery of the transferred consideration. The purpose of paragraph 3, of course, is to track the language of the Act, which provides that a delivery occurs upon "the actual, constructive or attempted transfer of possession of a controlled substance, with or without consideration." 720 ILCS 570/102(h) (West 2006). Thus, the State is not required to prove a transfer of consideration in any case, whether the delivery occurs between best friends or complete strangers.

For these reasons, we hold that the trial court was not prohibited from giving paragraph 3 of the jury instruction, in a case of actual physical transfer, and that the instruction's accurate statement of the law did not minimize the State's burden of proof.[4]   Thus, we find that the trial court did not abuse its discretion by giving paragraph 3.

## II. Police Radio Messages

On appeal, the defense claims that the trial court erred by allowing police officers to testify, over the defense's hearsay objection, about the contents of radio messages received from other officers.

The officers, who were the declarants of the radio messages, were all witnesses at trial; they testified about the content of their own statements and were subject to cross-examination about them.  Thus, the defendant has not raised on appeal any claims concerning his sixth amendment right to confront and cross-examine the witnesses against him.  U.S. Const., amend. VI; *People v. Spicer*, 379 Ill. App. 3d 441, 449 (2007) (discussing the differences between "[h]earsay analysis and sixth amendment analysis").

---

[4]In his appellate reply brief, the defendant states that he "has never challenged that this [paragraph 3] was an incorrect statement of law."

Defendant's claim on appeal concerns solely an alleged violation of the rule against hearsay. Hearsay is a statement that is offered to prove the truth of the matter asserted, made by the declarant at a time when he or she was not testifying at trial. *People v. Dunmore*, 389 Ill. App. 3d 1095, 1106 (2009); *Spicer*, 379 Ill. App. 3d at 449; Fed. R. Evid. 801(c). The rule against hearsay generally prevents the admission of hearsay statements in evidence at trial. *Spicer*, 379 Ill. App. 3d at 449. However, the rule has many exceptions. *Spicer*, 379 Ill. App. 3d at 449. In considering a hearsay objection, a court must decide, first, whether the statement is, in fact, hearsay. *Dunmore*, 389 Ill. App. 3d at 1106. If the statement is hearsay, the court must decide, second, if it is still admissible under one of the many exceptions. *Spicer*, 379 Ill. App. 3d at 449-50.

To these two decisions by the trial court, an appellate court will apply an abuse-of-discretion standard of review. The trial court has discretion in deciding whether statements were, in fact, hearsay and, if they were, whether they were still admissible under an exception to the hearsay rule. *Dunmore*, 389 Ill. App. 3d at 1106 (applying an abuse-of-discretion standard to a trial court's ruling that a statement was hearsay and that it did not qualify under an exception); *Spicer*, 379

29

Ill. App. 3d at 450 (applying an abuse-of-discretion standard to a trial court's ruling that a hearsay statement was admissible as an exception). Hearsay rulings by a trial court are similar to other evidentiary rulings, which are generally reversed only for an abuse of discretion. *Dunmore*, 389 Ill. App. 3d at 1106. A trial court's decision is considered an abuse of discretion only when the decision is arbitrary, fanciful or unreasonable, or where no reasonable person would take the view adopted by the trial court. *Dunmore*, 389 Ill. App. 3d at 1105.

Defendant's objection is not to the admission of the information contained in the radio messages, but to the recounting of the messages by the officers who heard them. On appeal, defendant does not object to the testimony by police officers concerning the content of the radio messages that they voiced, but rather objects only to the corroborating testimony by the officers who heard the messages.

On appeal, defendant notes seven places in the trial testimony where receiving officers testified about the content of radio message that they had heard. The seven messages are summarized in the following chart. In the chart, Officer Srisuth is identified as the "Buy Officer," Officer Di Franco is identified as the "Surveillance Officer," and Detective Smith is identified as the "Enforcement

30

No. 1-08-0194

Officer."

Summary of Radio Messages:

| | Testifying Witness | Declarant | Timing of Message | Substance of Radio Message |
|---|---|---|---|---|
| 1. | Buy Officer | Surveillance Offficer | Prior to controlled buy. | Description and location of seller. |
| 2. | Enforcement Officer | Buy Officer | After controlled buy. | Confirmation of controlled buy; description and location of seller. |
| 3. | Surveillance Officer | Buy Officer | After controlled buy. | Confirmation of controlled buy. |
| 4. | Enforcement Officer | Surveillance Officer | After controlled buy. | Confirmation of controlled buy; observation of a subsequent transaction; location of seller. |
| 5. | Enforcement Officer | Surveillance Officer | After detention. | Confirmation that correct individual detained. |

31

| 6. | Enforcement Officer | Buy Officer | After detention | Confirmation that correct individual detained. |
|----|----|----|----|----|
| 7. | Surveillance Officer | Buy Officer | After detention. | Confirmation that correct individual detained. |

For two of the seven statements listed above, defense counsel failed to object at trial. The statements that occurred without objection were statements (3) and (6), above. The Illinois Supreme Court has held that a "defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review." *People v. Woods*, 214 Ill. 2d 455, 470 (2005); *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007). When a defendant has failed to preserve an error for review, we may still review for plain error. *Piatkowski*, 225 Ill. 2d at 562-63; 134 Ill. S. Ct. R.. 615(a) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court"). Since the defendant did raise this issue in his postrial motion, the plain-error doctrine applies only to statements (3) and (6), but not to the other statements.

"[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is

so closely balanced that the error alone threaten[s] to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565; *Woods*, 214 Ill. 2d at 471. However, before we reach the issue of plain error, we must first determine whether any error occurred at all. *People v. Walker*, 392 Ill. App. 3d 277, 294 (2009) ("[i]n a plain[-]error analysis, 'the first step' for a reviewing court is to determine whether any error at all occurred"). Since we find, for the reasons discussed below, that no error occurred, we do not need to perform a plain-error analysis.

In the case at bar, the trial court overruled defendant's hearsay objections without identifying the basis of its ruling. Thus the trial court did not specifically find whether the testimony was hearsay or, if it was, what exception applied. Since we may affirm a trial court's ruling on any basis supported in the record, we will examine first whether the testimony was, in fact, hearsay. *People v. Dinelli*, 217 Ill. 2d 387, 403 (2005) ("we may affirm the circuit court on any basis supported by the record").

A statement offered for some reason, other than for the truth of the matter asserted, is generally admissible because it is not hearsay. *Dunmore*, 389 Ill. App. 3d at 1106. For example, if a statement is offered to prove its effect on the listener's state of mind, or to show why the listener subsequently acted as he or she did, then the statement is not hearsay. *Dunmore*, 389 Ill. App. 3d at 1106. Therefore, if a statement is offered, not for the truth of the matter asserted in its contents, but to explain the actions or steps that a police officer subsequently took during the course of an investigation, then the statement is not hearsay. *People v. Jura*, 352 Ill. App. 3d 1080, 1086 (1st Dist. 2004); *People v. Edgecombe*, 317 Ill. App. 3d 615, 627 (1st Dist. 2000); *People v. Warlick*, 302 Ill. App. 3d 595, 598-99 (1st Dist. 1998).

Defendant cites several successful hearsay challenges to police radio messages, where this court held that the trial court had erred by admitting the messages. For example, in *Jura*, the trial court erred by admitting testimony by three officers, in a gun possession case, that a police radio broadcast had provided the location and description of a person with a gun and that defendant's location and description matched it. *Jura*, 352 Ill. App. 3d at 1086-88, 1093-94 (we reversed on grounds of both hearsay and ineffective assistance of counsel). In

34

*Edgecombe*, the trial court erred in admitting an officer's testimony about a radio call that a vehicle's occupants had fled after a vehicle stop; that the police apprehended one occupant (who later became the defendant); and that the vehicle matched the description of the getaway vehicle in an armed robbery. *Edgecombe*, 317 Ill. App. 3d at 627 (we reversed and remanded on other grounds). In *Warlick*, the trial court erred in admitting an officer's testimony that he had received a radio call about "a burglary in progress," when the sole defense at trial was that defendant had been seeking shelter, not to burglarize. *Warlick*, 302 Ill. App. 3d at 600-01 (however, we held that the error was harmless). Compare with *People v. Townsend*, 275 Ill. App. 3d 200, 203, 206 (1st Dist. 1995) (a police radio dispatch about an "armed robbery in progress" was admissible, where the issue at trial was whether defendant had committed the robbery, not whether a robbery had occurred).

However *Jura*, *Edgecomb*, and *Warlick* differ from the case at bar because, in these cases, (1) the declarant did not testify; (2) the only evidence of the contents of the message was the testimony of the receiving officer; and (3) the testimony thus affected defendant's sixth amendment right to confront the witnesses against him. By contrast, in the case at bar, (1) the declarant did testify

and was subject to cross-examination; (2) the events described in the radio messages were received into evidence from the officers who had witnessed the events firsthand; and (3) the sixth amendment is not at issue.

Despite these differences, the cases cited by defendant are close enough in substance to shed some light on our issue. In all three cases, we found that the State was using the investigative procedure as a means to place substantive information in front of the jury. *Edgecombe*, 317 Ill. App. 3d at 627 ("[t]he State may not use the limited investigatory procedure exception to place into evidence the substance of any out-of-court statement"); *Jura*, 352 Ill. App. 3d at 1088-89 (the hearsay was used as substantive evidence to prove "the very essence of the dispute: whether the defendant was the man who possessed the gun"); *Warlick*, 302 Ill. App. 3d at 600-01 ("a serious issue in the case was whether a burglary in fact was taking place" and the unidentified declarant in the radio call stated that a "burglary [was] in progress").

By contrast, in the case at bar, the State was not using the investigative procedure as a means to place substantive information in front of the jury. The State used the declarants themselves as the means of placing in front of the jury what they had personally done and observed. The purpose of having other

officers recount what they heard over the radio was to explain why the receiving officers then took the actions that they did. For example, the buy officer needed to explain that it was information received from the surveillance officer that prompted him to approach this individual at this location. The enforcement officer needed to explain that it was the confirmation of a controlled buy from both the buy and surveillance officers that led to his detention of the individual described. The three officers and trial witnesses were acting in unison, almost like the arms and legs of one organism, linked at its nerve center by the radio calls. Their actions and reactions only make sense when viewed in relation to one another. Thus, the radio calls had the nonhearsay purpose of establishing their effect on the listener, rather than being admitted for the truth of the matter asserted. The matters asserted were admitted for their truth through the individuals who were showing what they had actually observed or how they acted in the manner that they did.

The case at bar is more factually similar to *Rivas* than the cases cited by defendant. *Rivas*, 302 Ill. App. 3d at 430-31. The *Rivas* case, like the case at bar, involved a controlled buy where defendant was subsequently charged with drug delivery. *Rivas*, 302 Ill. App. 3d at 424, 427. The *Rivas* case, like the case at bar,

concerned testimony by an enforcement officer about the contents of a radio call from a surveillance officer, which led the enforcement officer to arrest the defendant. *Rivas*, 302 Ill. App. 3d at 431. In *Rivas*, we held that the trial court did not err by admitting the enforcement officer's testimony that he made the arrest after receiving a radio call from the surveillance officer that the suspect had driven to a location, carried a package into an office, and was driving away. *Rivas*, 302 Ill. App. 3d at 430-31. In *Rivas*, as in the case at bar, the surveillance officer testified at trial, and the statement was needed to explain why the enforcement officer subsequently acted to arrest the suspect. *Rivas*, 302 Ill. App. 3d at 427, 431. In *Rivas*, as in the case at bar, we found no error. *Rivas*, 302 Ill. App. 3d at 431. See also *Townsend*, 275 Ill. App. 3d at 203, 206 (a police radio dispatch about an "armed robbery in progress" was admissible to explain "the reason and manner in which the police conducted their investigation").

For these reasons, we find that, under the circumstances of this case, the statements were not hearsay, and the trial court did not abuse its discretion by admitting them. Even if we found an abuse of discretion, any error was harmless, for the reasons explained below, in section III (D) of this opinion.

III. Illinois Supreme Court Rule 431(b)

No. 1-08-0194

Defendant seeks a new trial, because the trial court failed to question potential jurors about their understanding and acceptance of certain principles of law, as required by the amended Illinois Supreme Court Rule 431(b). Ill. S. Ct. R. 431(b) (eff. May 1, 2007) (2007 version).

Although supreme court rules are not statutes, they have " 'the force of law, and the presumption must be that they will be obeyed and enforced as written.' " *Robidoux v. Oliphant*, 201 Ill. 2d 324, 332 (2002) (quoting *Bright v. Dicke*, 166 Ill. 2d 204, 210 (1995)). When we review issues concerning the interpretation of a supreme court rule, we apply a *de novo* standard of review. *People v. Reed*, 376 Ill. App. 3d 121, 125 (2007).

A. History of Rule 431(b): The Four Questions

The rule at issue, Illinois Supreme Court Rule 431(b), is a codification of the Illinois Supreme Court's holding in *People v. Zehr*, 103 Ill. 2d 472, 477 (1984). In *Zehr*, our supreme court held that a trial court erred during *voir dire* when it refused the defense counsel's request to ask potential jurors about four fundamental principles of law. *Zehr*, 103 Ill. 2d at 476-78. In *Zehr*, our supreme court held that it is "essential to the qualification of jurors in a criminal case *** that they know" these four fundamental principles: (1) that defendant is

39

presumed innocent; (2) that defendant was not required to produce any evidence on his own; (3) that defendant must be proved guilty beyond a reasonable doubt; and (4) that defendant's failure to testify on his own behalf could not be held against him. *Zehr*, 103 Ill. 2d at 477. These four principles are now commonly known as the "*Zehr* principles."

To ensure compliance with its 1984 *Zehr* decision, our supreme court amended Rule 431 twice, first in 1997 and then again 10 years later in 2007. In 1997, the supreme court amended Rule 431 to provide that, if requested by defendant, the trial court must ask potential jurors whether they understood and accepted the *Zehr* principles. 177 Ill. S. Ct. R. 431, Committee Comments (adopted Apr. 3, 1997). According to the accompanying committee notes, the 1997 amendment sought to "end the practice where the judge makes a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law." 177 Ill. S. Ct. R. 431, Committee Comments (adopted Apr. 3, 1997).

The 1997 version of Supreme Court Rule 431(b) stated, in full:

"(b) If requested by the defendant, the court shall ask each potential juror, individually or in a group,

whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." (Emphasis added.) 177 Ill. S. Ct. R. 431(b) (eff. May 1, 1997).

This court held that the 1997 version of Rule 431(b), as quoted above, did not require the trial court to ask about the *Zehr* principles, unless defense counsel

asked the trial court to do so. *People v. Gilbert*, 379 Ill. App. 3d 106, 109-10 (2008) (citing *People v. Williams*, 368 Ill. App. 3d 616, 623 (2006), and *People v. Foreman*, 361 Ill. App. 3d 136, 146 (2005)); *People v. Martinez*, 386 Ill. App. 3d 153, 160-61 (2008).

In 2007, our supreme court amended the rule again. The 2007 amendment deleted the first five words: "If requested by the defendant." Ill. S. Ct. R. 431 (b) (eff. May 1, 2007). This deletion had the effect of requiring the trial court to ask about the four *Zehr* principles, whether or not the defendant had made the request. The 2007 version of Rule 431(b), which is still in effect, states:

"(b) The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify

42

when the defendant objects.

The court's method of inquiry shall provide each juror an

opportunity to respond to specific questions concerning the principles

set out in this section." Ill. S. Ct. R. 431(b) (eff. May 1, 2007).

### B. The Trial Court's Error

There is no question that, in the case at bar, the trial court erred. The 2007

version applied to the case at bar, and the trial court failed to implement the

changed version. Since defendant's trial began on August 28, 2007, and since the

2007 version of Rule 431(b) took effect several months earlier on May 1, 2007,

the 2007 version applied to the case at bar. Although the new version applied,

the trial court failed to ask potential jurors during *voir dire* whether they

understood and accepted the *Zehr* principles, as the 2007 version required.

*Thompson*, 238 Ill. 2d at 607 ("The trial court must ask each potential juror

whether he or she understands and accepts each of the principles in the rule.").

There is no dispute between the parties that the trial court erred when it

failed to question the potential jurors about the four *Zehr* principles listed in Rule

431(b). The dispute between the parties is whether the evidence was so closely

balanced that this error alone threatened to tip the scales of justice against

43

defendant. *Thompson*, 238 Ill. 2d at 613.

Defendant had originally argued that the error was so fundamental to the integrity of the justice system that it required automatic reversal. However, since the filing of the original briefs, our supreme court held in *Thompson* that automatic reversal is not required. *Thompson*, 238 Ill. 2d at 616 ("We will not impose automatic reversal for every violation of Rule 431(b) ***"). After we vacated our original *Hammonds* decision and permitted supplemental briefing, defendant abandoned this argument, as *Thompson* requires.

### C. Plain-Error Doctrine

Since defendant did not object at trial or raise this issue in his posttrial motion, we review the issue under the plain-error doctrine. *Thompson*, 238 Ill. 2d at 611-12 (applying plain-error review where defendant failed to object at trial to a Supreme Court Rule 431(b) error).

As noted above, the Illinois Supreme Court has held that a "defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review." *Woods*, 214 Ill. 2d at 470; *Piatkowski*, 225 Ill. 2d at 564. When a defendant has failed to preserve an error for review, we may still review for plain error. *Piatkowski*, 225 Ill. 2d at 562-63;

Ill. Sup. Ct. R. 615(a) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court"). In the case at bar, defendant did not object at trial or raise this issue in his posttrial motion.[5] Defendant's appellate brief conceded that "defense counsel did not object to the defendant's failure to comply with Rule 431(b)."

However, defendant claims that he did not waive the issue for appeal, because: (1) requiring defense counsel to object would negate the effect of the 2007 amendment, which obligated the trial court to ask the four questions *sua sponte*; and (2) the waiver rules are relaxed when the objection is directed to the trial judge's conduct. *Thompson*, 238 Ill. 2d at 612 (forfeiture rule may be relaxed in extraordinary circumstances where objection is directed to trial judge's

---

[5]In his posttrial motion, defendant raised boilerplate claims such as a denial of due process and equal protection, and the State's failure to prove guilt beyond a reasonable doubt. The claims specific to defendant's case were that the trial court "erred in giving instructions on behalf of the State over the Defendant's objection" and "erred by allowing Chicago Police Officers to testify to the content of their radio transmissions, thereby allowing the jury to hear impermissible hearsay evidence."

No. 1-08-0194

conduct).

In *Thompson*, our supreme court was presented with the second argument and rejected it, but it was not presented with defendant's first argument. *Thomspon*, 238 Ill. 2d at 612. Both arguments are unpersuasive on the facts of this case.

First, requiring defense counsel to object to preserve the error for appeal would not negate the mandatory nature of the 2007 amendment. Trial judges are presumed to follow the law, and we assume that the mandatory nature of the 2007 amendment will be followed. In addition, we apply the plain-error doctrine to other situations where actions are mandatory, and we have not been presented with a reason to carve out an exception for this issue alone. *E.g.*, *People v. Lewis*, 234 Ill. 2d 32, 39-42 (2009) (absent "exceptional circumstances," the plain-error doctrine will be applied even though the trial court failed to follow a statutorily mandated procedure).

Second, as our supreme court has already observed in *Thompson*, there was no reason to believe that an objection would have fallen on unreceptive ears. *Thompson*, 238 Ill. 2d at 612. Quite the contrary is true, considering that the questions were mandatory. *Thompson*, 238 Ill. 2d at 612. Defendant's failure to

46

object at trial robbed the trial court of the opportunity to correct the error, and defendant's failure to object in a posttrial motion deprived a reviewing court of any factual findings which the trial court might have made concerning the credibility of the witnesses and their contribution to the weight of the evidence against defendant and, thus, the possible effect of the error. *People v. Davis*, 378 Ill. App. 3d 1, 10-11 (2007). As a result, this court will review for plain error only. *Thompson*, 238 Ill. 2d at 612.

As noted above, "the plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threaten[s] to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565; *Woods*, 214 Ill. 2d at 471. With a plain-error analysis, "it is the defendant who bears the burden of persuasion with respect to prejudice." *Woods*, 214 Ill. 2d at 471. As noted above, defendant now argues only with respect to the first prong.

### D. Not Closely Balanced

We find that the evidence in the case at bar was not closely balanced.

In the case at bar, the jury found defendant guilty of the delivery of a controlled substance. The evidence supporting the conviction was overwhelming. An undercover police officer testified that he purchased crack cocaine from defendant. A surveillance officer witnessed the undercover purchase, as well as two more additional transactions in the same location, where defendant exchanged small items for cash. A forensic chemist confirmed that the item purchased during the undercover buy was cocaine. No witnesses testified for the defense. Although the prerecorded $10 bill used in the undercover purchase was not recovered from defendant, the surveillance officer testified that he observed defendant pull out an unknown amount of money from a wad of bills and hand it to a subsequent purchaser, when defendant was apparently making change.

In his argument for finding the evidence closely balanced, defendant stated in his appellate brief that "[t]he evidence in this case turned on the credibility of the officers, and was thus close." Defendant cited in support: *People v. Evans*, 369 Ill. App. 3d 366 (2006), and *People v. Wilson*, 199 Ill. App. 3d 792 (1990). In both cases, the appellate court found the evidence closely balanced, where the

conviction had forced the jurors to pick one competing witness over another. In *Evans*, the appellate court found that "the verdict was based primarily upon a credibility determination of the competing theories testified to by the parties' respective experts." *Evans*, 369 Ill. App. 3d at 376. In *Wilson*, the court found that the verdict "rested on the jury's determination of the relative credibility of the victim" and a witness who had "testified that the victim had a motive to lie about the assault." *Wilson*, 199 Ill. App. 3d at 795. By contrast, in the case at bar, no competing witnesses testified at trial, and thus the jury was not asked to determine "relative credibility." *Wilson*, 199 Ill. App. 3d at 795. In the case at bar, the jurors were asked merely to assess the testimony of two police officers, who fully corroborated each other, and whose testimony was not called into question by a competing witness, cross-examination or other evidence. The need for this assessment did not make the evidence "closely balanced." *Evans*, 369 Ill. App. 3d at 376;. *Wilson*, 199 Ill. App. 3d at 795.

For the reasons discussed above, we find that reversal is not required under the plain-error doctrine. The error was not "so closely balanced that the error alone threatened to tip the scales of justice against the defendant." *Piatkowski*, 225 Ill. 2d at 565; *Woods*, 214 Ill. 2d at 471.

49

IV. Refusal to Rule on Defendant's Motion

Fourth, defendant claims that the trial court erred by refusing to rule, until after defendant testified, on defendant's motion *in limine* concerning the admissibility of his prior convictions for impeachment purposes. For the reasons discussed below, we find that defendant failed to preserve his objection to the trial court's refusal to rule.

Prior to trial, both the State and the defense filed motions concerning the admission of defendant's prior convictions if he testified. The trial court stated that it "would reserve ruling on this matter until the defendant has testified." On appeal, defendant claims that, without knowing how the trial court would rule, he decided not to testify.

Defendant acknowledges on appeal that the Illinois Supreme Court already addressed this same issue in *People v. Patrick*, 233 Ill. 2d 62 (2009), and that in *Patrick*, our supreme court held that a nontestifying defendant does not have the "right to appellate review of this issue." *Patrick*, 233 Ill. 2d at 79. Our supreme court clearly stated that "defendants must take the risk and present the testimony for the issue to be reviewable." *Patrick*, 233 Ill. 2d at 79. However, defendant's counsel asks us to find that our supreme court's holding is "erroneous."

Obviously, defense counsel knows that a holding by our supreme court is binding on this court. Presumably, the defense presents this argument in order to preserve it. As the defense is well aware, we must reject this argument, until and if such time that the supreme court rules differently.

### V. State's Rebuttal Closing Argument

Fifth, defendant claims that prosecutorial misconduct during the State's rebuttal closing argument denied defendant a fair trial. For the reasons stated below, we find that the prosecutor did not commit misconduct in the State's rebuttal closing argument by responding to remarks made during the defense closing.

### A. Plain-Error Review

Defendant failed to object to this issue both at trial and in his posttrial motion. At trial, defendant did not object once during either the State's initial closing argument or the State's rebuttal closing argument. In defendant's posttrial motion, defendant objected both to the jury instruction defining a delivery and to the admission of the police radio messages on hearsay grounds, but he did not raise any objections to the State's closing arguments.

As we already discussed above, to preserve an alleged trial error for

51

appellate review, a defendant must both:  (1) specifically object at trial; and (2)

raise the specific issue again in a posttrial motion.  *Woods*, 214 Ill. 2d at 470;

*Piatkowski*, 225 Ill. 2d at 564.  However, even when a defendant fails to preserve

an error for review, an appellate court may still review for plain error. *Piatkowski*,

225 Ill. 2d at 562-63; Ill. S. Ct. R. 615(a).  The plain-error doctrine permits an

appellate court to reverse on the basis of unpreserved error if either:  (1) the error

was "clear or obvious" and  the evidence at trial was so closely balanced that this

error could have tipped the scales against the defendant; or (2) the unpreserved

error was "so serious" that it challenged the integrity of the judicial process and

the fairness of defendant's trial.  *Piatkowski*, 225 Ill. 2d at 565; *Woods*, 214 Ill.

2d at 471.  Before a reviewing court analyzes the two prongs of the plain-error

doctrine, its first step is to determine whether any error occurred at all.  *Walker*,

392 Ill. App. 3d at 294.  For the reasons discussed below, we find that no error

occurred.

## B. Standard of Review

It is not clear whether the appropriate standard of review for this issue is *de*

*novo* or abuse of discretion.  This court has previously made this same

observation in both *People v. Phillips*, 392 Ill. App. 3d 243, 274-75 (2009), and *People v. Johnson*, 385 Ill. App. 3d 585, 603 (2008). The Second District agreed with our observation that the standard of review for closing remarks is an unsettled issue. *People v. Robinson*, 391 Ill. App. 3d 822, 839-40 (2009).

The confusion stems from an apparent conflict between two supreme court cases: *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007), and *People v. Blue*, 189 Ill. 2d 99, 128, 132 (2000). In *Wheeler*, our supreme court held: "Whether statements made by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue this court reviews *de novo*." *Wheeler*, 226 Ill. 2d at 121. However, the supreme court in *Wheeler* cited with approval *Blue*, in which the supreme court had previously applied an abuse-of-discretion standard. *Wheeler*, 226 Ill. 2d at 121. In *Blue* and numerous other cases, our supreme court had held that the substance and style of closing argument is within the trial court's discretion, and that the trial court's decision will not be reversed absent an abuse of discretion. *Blue*, 189 Ill. 2d at 128, 132 ("we conclude that the trial court abused its discretion" by permitting certain prosecutorial remarks in closing); *People v. Caffey*, 205 Ill. 2d 52, 128 (2001); *People v. Emerson*, 189 Ill. 2d 436, 488 (2000); *People v. Williams*, 192 Ill. 2d 548, 583 (2000); *People v.*

53

*Armstrong*, 183 Ill. 2d 130, 145 (1998); *People v. Byron*, 164 Ill. 2d 279, 295 (1995).  Our supreme court had reasoned:  "Because the trial court is in a better position than a reviewing court to determine the prejudicial effect of any remarks, the scope of closing argument is within the trial court's discretion."  *People v. Hudson*, 157 Ill. 2d 401, 441 (1993).   Following *Blue* and other supreme court cases like it, this court had consistently applied an abuse-of-discretion standard. *People v. Tolliver*, 347 Ill. App. 3d 203, 224 (2004); *People v. Abadia*, 328 Ill. App. 3d 669, 678 (2001).

Since *Wheeler*, appellate courts have been divided regarding the appropriate standard of review.  The second and third divisions of the First District have applied an abuse-of-discretion standard, while the Third and Fourth Districts and the fifth division of the First District have applied a *de novo* standard of review. Compare *People v. Love*, 377 Ill. App. 3d 306, 313 (1st Dist. 2d Div. 2007) (Wolfson, J.), and *People v. Averett*, 381 Ill. App. 3d 1001, 1007 (1st Dist. 3d Div. 2008) (Quinn, P.J.), with *People v. McCoy*, 378 Ill. App. 3d 954, 964 (3d Dist. 2008), *People v. Palmer*, 382 Ill. App. 3d 1151, 1160 (4th Dist 2008), *People v. Ramos*, 396 Ill. App. 3d 869, 874 (1st Dist. 5th Div. 2009) (Toomin, P. J.); *People v. Vargas*, No. 1-08-0383, slip op. at 11 (May 6, 2011)

No. 1-08-0194

(Epstein, J.).

However, we do not need to resolve the issue of the appropriate standard of review at this time, because our holding in this case would be the same under either standard. This is the same approach that we took in both *Phillips* and *Johnson*, and the same approach taken by the Second District in its *Robinson* opinion. *Phillips*, 392 Ill. App. 3d at 275; *Johnson*, 385 Ill. App. 3d at 603; *Robinson*, 391 Ill. App. 3d at 840 ("In any event, like the *Johnson* court, we leave the resolution of this issue to another day, as our conclusion would be the same applying either standard.").

### C. Substantial Prejudice

A State's closing will lead to reversal only if the prosecutor's remarks created "substantial prejudice." *Wheeler*, 226 Ill. 2d at 123; *People v. Johnson*, 208 Ill. 2d 53, 64 (2003); *People v. Easley*, 148 Ill. 2d 281, 332 (1992) ("The remarks by the prosecutor, while improper, do not amount to substantial prejudice."). Substantial prejudice occurs "if the improper remarks constituted a material factor in a defendant's conviction." *Wheeler*, 226 Ill. 2d at 123.

When reviewing claims of prosecutorial misconduct in closing argument, a reviewing court will consider the entire closing arguments of both the prosecutor

55

and the defense attorney, in order to place the remarks in context. *Wheeler*, 226 Ill. 2d at 122; *Johnson*, 208 Ill. 2d at 113; *People v. Tolliver*, 347 Ill. App. 3d 203, 224 (2004). A prosecutor has wide latitude during closing argument. *Wheeler*, 226 Ill. 2d at 123; *Blue*, 189 Ill. 2d at 127. "In closing, the prosecutor may comment on the evidence and any fair, reasonable inferences it yields ***." *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005).

"Statements will not be held improper if they were provoked or invited by the defense counsel's argument." *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). For example, in *Glasper*, defendant argued that the prosecutor had "shifted the burden of proof to defendant" when, in response to defendant's claim of a coerced confession, the prosecutor had stated in rebuttal closing: " 'Where's the evidence of that?' " *Glasper*, 234 Ill. 2d at 212. Our supreme court held that the comment "did not shift the burden of proof to defendant," but that it merely "pointed out that no evidence existed in this case to support defendant's theory" and that it was "invited by defense counsel's argument." *Glasper*, 234 Ill. 2d at 212.

Similarly, in the case at bar, we find, for the reasons discussed below, that the prosecutor's comments in the rebuttal closing did not shift the burden of proof

and were invited by the defense counsel's argument. Although we have reviewed the closing arguments in their entirety, we provide in this opinion only the remarks made by defense counsel to which the prosecutor responded, as well as the remarks by the prosecutor which defendant claims on appeal were objectionable.

## D. Contested Remarks

On appeal, defendant complains about three sets of remarks made by the prosecutor during the State's rebuttal closing, claiming that: (1) one set shifted the burden of proof to defendant by implying that he should have requested scientific testing: (2) a second set minimized the State's burden of proof; and (3) a third set bolstered the credibility of the police witnesses by invoking their authority as police officers.

## 1. Scientific Testing

In closing argument, defense counsel discussed, at length, the lack of DNA and fingerprint testing, stating:

> "The Chicago Police Department chose *** not to
> request any fingerprint evidence in this case. They
> chose not to request DNA evidence in this case, and

they're the ones who are in custody of the supposed

evidence.

Don't let the State try and shift that burden on us.

We don't have custody of that evidence. They have

custody of that evidence. And three days later, the

person in the crime lab has custody of the evidence and

is handling it without gloves because no requests have

been made.

You don't have to accept that. You don't have to

say that's okay. They didn't do a good enough job as

far as that's concerned.

And it's up to you to tell them that that is not

acceptable."

On appeal, defendant challenges the following remarks which the

prosecutor made in response. The State confirmed that defendant did not have a

burden in this case, but noted that defense counsel had elicited testimony from the

State's forensic expert that requests for DNA or fingerprint testing may be

submitted by the police, the State, or the defense. Specifically, the prosecutor

58

stated:

> "And you heard from ISP, the Illinois State Police
> Crime Lab, Miss Paula Bosco Szum. She as well,
> thousands of narcotics she's personally been given to
> analyze and she specified to you in what situations DNA
> or fingerprints is [*sic*] requested of those thousands of
> times.
>
> What she said matched exactly what the officer
> said. Counsel is correct. The defendant bears
> absolutely no burden in this case. But she asked the
> question of Miss Szum to describe those circumstances.
>
> What was Ms. Szum's answer? Sometimes, it's
> from the police of those two or three times, the State or
> the Defense."

After defense counsel argued in its closing "[d]on't let the State try and shift that burden on us," the State was almost forced to respond with a denial. The State's response included drawing the jury's attention to testimony that the defense had elicited on cross-examination. During direct examination, the State

had asked its forensic expert if both the State and the defense could request DNA or fingerprint testing. Instead of objecting to the question, the defense made the strategic decision to explore the topic on cross-examination, eliciting that a defense request had occurred only once during the career of that witness. On appeal, the defendant cannot be heard to complain now about either an argument that he invited or testimony that he elicited. *Glasper*, 234 Ill. 2d at 205 ("Defendant cannot complain that the State made reference to evidence in closing which defendant helped elicit.")

## 2. Burden of Proof

Defense counsel ended her argument by discussing the State's burden to prove guilt beyond a reasonable doubt. The defense argued:

> "Let's talk about reasonable doubt. No
>
> [recorded] funds. That's a reasonable doubt. No drugs
>
> recovered on [defendant]. That's a reasonable doubt.
>
> No video equipment used in this case. That's a
>
> reasonable doubt. No audio equipment used in this
>
> case. That's a reasonable doubt.
>
> The circumstances of how this identification was

constructed. That's a reasonable doubt. No DNA

evidence. That's a reasonable doubt."

On appeal, defendant challenges the following remarks which the

prosecutor made in response::

"[The defense] bear[s] no burden and let me say to

you, ladies and gentleman, this burden, it's not an

impossible burden.

It's not something made up just for

[defendant]. It is the same burden in every

criminal case across the nation, our nation. People

are convicted and tried everyday under the same

burden. It's not impossible. It's not impossible."

The above remarks were invited by defense's remarks that the absence of any

possible technological tool (DNA testing, video recording, etc.) created a

reasonable doubt. The reference to convictions occurring "every day" was not a

reference that we condone; however, its impact was lessened by the State's

immediately following comment that the State's burden was just short of

"impossible." Obviously, we on the appellate panel cannot know the tone with

which this remark was delivered. We know only that it was neither objected to by the defense counsel who heard it, nor cautioned by the trial judge who also heard it. From the cold and silent transcript, we cannot find reversible error from these words.

### 3. Police Credibility

Concerning the police officers' credibility, defense counsel argued in closing:

"Let's talk about the circumstances of the undercover police officer.

This person, as he described, he's talking to for three to five seconds. Bam, that's it, and you're going to buy that they gave this detailed description of what this individual looked like?

You know how they know what [defendant] was wearing? [Defendant] was arrested. ***

Of course, [defendant] is going to get identified during this drive by identification because he's the only individual that is standing there in the custody of two

Chicago police officers."

Defense counsel accused the police officers of "a lazy job of doing their police work."

In the State's rebuttal closing, the prosecutor responded:

"We are not hiding anything from you, ladies and gentlemen. They want you to believe that these officers are, that they are just lazy and trying to pin cases on this defendant. But why? That's what you need to ask yourself.

They basically want you to believe that these officers are here risking their careers individually and collectively. Why? For him? For less than a gram of cocaine? Does that make any sense to anyone? "

Without any evidence in the record of police fraud or misconduct, defense counsel argued in her closing argument that the police misidentified or framed her client in order to make an arrest. In rebuttal, the State responded: "Why?" In light of the defense's remarks, the State's response was not inappropriate, and thus no error occurred.

The remarks, quoted above, certainly did not rise to the level of plain error. Even if the remarks constituted error, they were harmless, in light of the overwhelming evidence against defendant, which was already discussed in another subsection of this opinion.

CONCLUSION

For the foregoing reasons, we affirm defendant's conviction. We find, first, that the trial court did not abuse its discretion by giving the jury the third paragraph of IPI Criminal 4th No. 17.05A, which clarified that a drug delivery could occur without the transfer of money or other consideration. Second, the trial court did not abuse its discretion by allowing police officers to testify about radio messages received from other police officers, who were also trial witnesses. Third, the trial court did err by failing to ask potential jurors whether they understood and accepted the four legal principles listed in Illinois Supreme Court Rule 431(b); however, the error did not rise to the level of plain error. Fourth, defendant failed to preserve his objection to the trial court's refusal to rule, until after defendant testified, on his motion *in limine* concerning the admissibility of his prior convictions for impeachment purposes. Fifth, the prosecutor did not commit misconduct in the State's rebuttal closing argument when she responded

No. 1-08-0194

to remarks made during the defense closing.

Affirmed.